Case 3:24-cv-09172-MAS-RLS    Document 14-6    Filed 01/16/25    Page 1 of 14 PageID: 89

EXHIBIT "3"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------x

KEVIN BEASLEY, and KEVIN BEASLEY
STUDIO, LLC,                                                        Index No.: 651397/2021

                              Plaintiffs,

              -against-                                    **Affidavit of Kevin Beasley in**
                                                           **Support of Motion for Default**
BAYVIEW AUTO WRECKERS, INC., MICHAEL
FANELLI, and DOES 1-10,

                              Defendants.
-------------------------------------------------------------------------x

I, Kevin Beasley, being duly sworn, depose and say:

1.       I have reviewed the complaint dated March 2, 2021, and aver that the factual

allegations made therein are true.

### Introductory Facts

2.       I am a contemporary African-American artist whose artworks are highly valued

and very much in demand. My works deal with African-American culture and cultural

connotations, have been widely exhibited, and are held in the collections of internationally-

renowned art museums. I am the sole owner of plaintiff Kevin Beasley Studio, LLC, and all of

the facts stated herein are also made in behalf of my eponymous LLC.

3.       In the spring of 2017, I was organizing works for my second exhibition at Casey

Kaplan Gallery in New York. For the show's centerpiece I decided to create a new artwork that I

had been considering for some time, dealing with the African-American community's

longstanding affinity for Cadillac vehicles (which dates back to at least the 1920s and 1930s,

when company policy prohibited sales to Blacks) as an aspirational luxury brand and symbol of

success – which can be seen today in the popularity of the Cadillac brand in rap music videos,

and among athletes and entertainers, for example. As a symbol of pop culture, it was integral to my artistic vision that I crush a Cadillac.

4.      To execute this project, I needed to purchase a vehicle, and gave considerable thought to the one I ultimately chose: a 2008 white Cadillac Escalade ESV. While Cadillac has made many models over the more than 100 years of its existence, I purposefully chose the Escalade because it is the brand's most luxurious and expensive model. I required a Cadillac with a white exterior and cream interior because of this color scheme's popularity in the Black community, signifying a level of purity and beauty, and contrasting with the black Escalades driven by many Uber and taxi and car service drivers. Finally, I specifically looked for a model year from 2007 onward when the Escalade was totally redesigned and updated to be significantly more luxurious than models from the late 1990s to 2006. As I live in New York City, I searched the Northeast and mid-Atlantic states looking for the most pristine vehicle available at the time, and in March 2017 found one for sale by an automobile dealer in Connecticut.

5.      Before I purchased the vehicle, I needed to make sure that I could find a vendor to crush the car. I called a number of wreckers and junkyards, but none would crush the car and then allow me to keep it, until I reached out to defendant Bayview Auto Wreckers. In March 2017, I spoke with Bayview's owner/manager, defendant Michael Fanelli, and was completely transparent about the fact that I am an artist, that I was planning to buy a 2008 Escalade for a new artwork for my May exhibition, that I needed to be able to direct and instruct regarding the process of crushing the car to achieve the effect I intended, that I needed to be able to take the car after it was crushed, that the model year of the car was particularly significant for this work, and that I and a film crew needed to be present for and document defendants' crushing of the vehicle as part of the mixed-media artwork I intended – as to all of which the defendants

acknowledged and agreed to. Based on defendants' representations, I drove to Connecticut and

on March 29, 2017, purchased the white 2008 Escalade ESV for $12,000.

6.      On April 5, 2017, I delivered the 2008 Escalade ESV to Bayview and contracted

with defendants to crush the vehicle for my mixed-media artwork. In hiring defendants to do so,

I reiterated the concerns and requirements that I had communicated to Mr. Fanelli in March

2017, and defendants affirmed that they would meet these requirements, and crush the vehicle

for a fee of $2,500. I made an appointment for the crushing to occur on April 12, 2017 so that I

could come back to Bayview's premises with my film crew.

7.      When my crew and I arrived at Bayview on April 12, 2017 as scheduled, we

found that despite defendants' representations, Bayview personnel had already begun crushing

the car. After Mr. Fanelli made a show of admonishing the Bayview employees, the filming

commenced, and later that month the crushed vehicle was delivered to the Casey Kaplan Gallery.

At the gallery, I was able to perform some additional work on the Escalade before the May 2017

exhibition, and I titled the work *Sport/Utility*. The exhibition was also titled *Sport/Utility*, after

the crushed Escalade, and press regarding the exhibit noted that it was a 2008 model.

8.      The completed *Sport/Utility* work was valued at $180,000 when it was first

completed in April 2017. As more museums have acquired and shown my work and the market

for my work has grown since that time, the value of *Sport/Utility* appreciated to $350,000 at the

start of November 2020.

9.      However, in November 2020, I obtained confirmation that defendants had

surreptitiously and purposely substituted a different Escalade for the 2008 Escalade ESV that I

had purchased in Connecticut and delivered to the defendants, when they received a CarFax

report indicating that the 2008 Escalade ESV had suffered collision damage in 2019 and 2020.

Investigation further confirmed that the vehicle that the defendants had delivered to me at the

Casey Kaplan Gallery in April 2017 was not the same car that I had delivered to Bayview, but a

different model Escalade from an earlier model year, prior to the Escalade redesign.

10.     As a result of the defendants' recently discovered deliberate misrepresentations,

their surreptitious conversion of my 2008 Escalade ESV, and their breaches of a contract that

was integral to the creation of one of my most well-known and publicized works, *Sport/Utility*

does not in fact represent my artistic vision and intent. It cannot be sold and literally has no value

as my artwork. As a further result, my integrity and the integrity of this work have been

questioned by the public, leaving me at risk of a significant loss in reputation, demand for my

works, and professional opportunities.

11.     Therefore, I and my LLC, through which I conduct business, request that the court

set this matter down for an inquest for an assessment of damages caused by the defendants'

deliberate, fraudulent conduct described in greater detail below.

### Statement of Facts

12.     My artworks illuminate the history, experience, culture, and cultural connotations

of African Americans. My work has been exhibited at renowned museums and galleries

throughout the world, including, for example, the Contemporary Art Center in Riga, Latvia

(2017); the Hammer Museum, Los Angeles (2017); the Renaissance Society at the University of

Chicago (2016); the San Francisco Museum of Modern Art (2016); the Hammer Museum at Art

& Practice, Los Angeles (2016); White Columns, New York (2016); the Solomon R.

Guggenheim Museum, New York (2015); MoMA PS1, Long Island City (2015); Art Gallery of

Ontario, Toronto (2015); the Glass House, New Canaan, CT (2015); the 2014 Whitney Biennial,

Whitney Museum of American Art, New York (2014); the Seoul Museum of Art, Seoul (2014);

The Museum of Modern Art, New York (2014); and the Studio Museum in Harlem, New York
(2014). Mr. Beasley's work is held in many collections, such as the collections of the Tate
Modern, London; the Art Gallery of Ontario, Toronto; the Museum of Modern Art, New York;
the Studio Museum in Harlem, New York; the Solomon R. Guggenheim Museum, New York;
Hammer Museum, Los Angeles; Perez Art Museum Miami; the Art Institute of Chicago; and
San Francisco Museum of Modern Art.

13.    I also often incorporate sound and music into my works, and have performed at
Lincoln Center for the Performing Arts, New York (2016); Art Gallery of Ontario, Toronto
(2016); Casey Kaplan Gallery, New York (2015); the Dallas Museum of Art (2015); the
Solomon R. Guggenheim Museum, New York (2015); the Museum of Contemporary Art,
Cleveland (2014); the Walker Art Center, Minneapolis (2014); Queens Museum of Art, New
York (2014); the Museum of Modern Art, New York (2012); and elsewhere.

14.    This action concerns an artwork that I intended to create in 2017 to comment on
the trappings of Blacks' social ascendance and my personal experiences, in relation to a largely
forgotten aspect of our American history.

15.    In or about March 2017, I purchased a 2008 Cadillac Escalade ESV which formed
the underpinning for my 2017 work entitled "*Sport/Utility*," described as "Stripped and crushed
2008 Cadillac Escalade ESV," with dimensions of: 65.5" x 93" x 203". "*Sport/Utility*" was
shown prominently in my second exhibition at the Casey Kaplan Gallery in New York, in May
2017, and was most recently valued at approximately $350,000, prior to the discovery of the
defendants' fraud, which fraud rendered the work valueless.

16.     This is a true and accurate depiction of the work, as exhibited at the Casey Kaplan Gallery:



17.     In creating *Sport/Utility*, I referenced the aspirational place of the Cadillac brand in U.S. history and in Black culture going back to the 1920s. Cadillac was established over one hundred years ago and has historically been at the forefront of American luxury brands. Culturally, Cadillac has been highly acquired and a staple within Black culture for multiple generations. For example, since the 1990s, various Cadillac models have repeatedly been featured in rap videos, and been purchased and modified by Black sports and entertainment figures.

18.     In the 1920s and 1930s, GM policy was that Cadillac was a Whites-only brand (although of course, discriminatory sales practices were not unique to General Motors at that time). In the midst of the Great Depression, GM was considering cancelling the Cadillac brand due to lack of profitability. But in the 1930s a Cadillac engineer canvassed owners and learned that despite GM's policy, many Blacks bought the cars (which were more economically attainable at that time than land or a house), either used or through a Caucasian front person. The engineer promoted revamping Cadillac's sale policy, resulting in Cadillac eventually lifting the

ban on sales to Blacks in 1932. GM began targeted advertising towards Blacks, and within eight years Cadillac became profitable, with sales having increased tenfold by 1940, and the advertising towards Blacks having become the first successful targeted marketing campaign. Thus, for nearly a century, the Cadillac brand has been a symbol of Black achievement, with distinct cultural connotations to Blacks.

19.     My awareness of this history and of Cadillac's status in the Black community – including among my own family, friends and acquaintances as I was growing up – led me to conceive of a project involving the destruction of a Cadillac. Although Cadillac has sold many different models over the years, I specifically required a white Cadillac Escalade because of its cultural significance: the Escalade is the most luxurious Cadillac, and very much a pop culture icon. A white exterior with cream interior color combination was also conceptually critical, as conveying a level of purity and beauty, particularly in the Black community, and standing in comparison to the black Escalades driven by many Uber drivers, and car and taxi services. The model became especially prized by successful Black businessmen, professionals, musicians, athletes, and actors.

20.     In finding the right vehicle to use for *Sport/Utility*, I was also specifically focused on the model year of the white Escalade I required. From the late 1990s to 2006 the Escalade, while luxurious, had a dated body design and a less than premium interior. From the 2007 model year onward, however, the Escalade was totally redesigned and updated. For *Sport/Utility,* I specifically looked for a later model (2007 onward) white exterior and interior Escalade.

21.     As I live in New York, I searched the Northeast and mid-Atlantic states in the winter and spring of 2017 for the most pristine post-2007 redesign I could find. In March 2017 I found an automobile dealer in Connecticut selling a 2008 white Escalade ESV. "ESV" stands for

"Escalade Stretch Vehicle," and denotes a longer body than a standard Escalade; it is more luxurious and valued.

22.     Before purchasing the car, however, I sought out a company that could meet the specific requirements that I needed to create the artwork. After contacting several junkyards which would not allow me to take a car after it was crushed, in or about March 2017 I contacted defendant Bayview and spoke with its owner/manager, defendant Michael Fanelli. I informed Mr. Fanelli that I am an artist and needed to have an Escalade crushed for a new artwork to be displayed in an upcoming gallery show. I explained to Mr. Fanelli that the model year of the car was critical, and that his project required *this* Escalade (that I had located in Connecticut). I further advised Mr. Fanelli that I had to be present for and able to direct the crushing of the Escalade, and that a film crew and I had be present to video and photograph the crushing process, as this documentation would be part of the artwork.

23.     Mr. Fanelli assured me that Bayview would allow me to take the car after it was crushed and would meet all of my requirements. Mr. Fanelli also specifically described certain measures Bayview ostensibly had to take before the car was crushed to ensure that certain things did not pop out or leak, so the final product would be safe – such as removing most of the interior, the engine, fuel tank, power train, fluids and tires. I agreed to this but demanded, and Mr. Fanelli/Bayview agreed, that at least the windshield, the dashboard, and the brand name would remain on the car, so that the car was identifiable as a 2008 Escalade. Had Bayview been unable to meet my requirements, I would not have contracted with Bayview to crush the car, and indeed would not have purchased the Escalade for the artwork.

24.     In reliance upon Mr. Fanelli's promises, I traveled to Connecticut and on March 29, 2017 purchased from automobile dealer Shamrock Motors LLC a white 2008 Escalade ESV

Case 3:24-cv-09172-MAS-RLS     Document 14-6     Filed 01/16/25     Page 10 of 14 PageID: 98

(VIN No.: 1GYFK6 6898R163185) that was manufactured in 2007 and originally sold in early 2008.

25.     Through Kevin Beasley Studio, LLC, I contracted with Bayview in or about early April 2017 to crush the 2008 Escalade, and delivered the Escalade to Bayview on or about April 5, 2017. Bayview's April 5, 2017 invoice noted that it was crushing the Escalade "FOR ART SHOW," although it misidentified the model year as "[20]07." When I delivered the 2008 Escalade on April 5, 2017, I had to make a subsequent appointment with Bayview for the crushing process, since it was to be documented, and I again instructed and confirmed with Mr. Fanelli that Bayview was not to commence the process until my film crew and I arrived the following week, on April 12, 2017, which Mr. Fanelli understood the importance of for the creation of the artwork, and again confirmed.

26.     However, when my film crew and I arrived at Bayview for the appointment on April 12, 2017, I observed that Bayview had already begun to crush the vehicle, and my crew and I saw a partially crushed white Escalade up on a high platform that we could not see well. When I urgently protested to Mr. Fanelli, Mr. Fanelli blamed Bayview's employees, reprimanded them and stated to me essentially, "I told those idiots to wait for you. They messed up. Sorry."

27.     With no other choice, I instructed my film crew to start filming from that point, unable to document the crushing of the vehicle from the beginning of the process, as was my originally disclosed intention.

28.     After the crushing process was completed, Bayview personnel did not allow me to take the Escalade or have it delivered immediately. Instead, Bayview personnel purposely lifted

it and placed it on top of a stack of crushed cars, making it impossible to inspect. As a result, I was unable to get close enough to the vehicle to examine it while it was at Bayview.

29.     Subsequently, I arranged with the defendants to have the Escalade delivered to the Casey Kaplan Gallery where I was preparing multiple artworks to be exhibited starting at the beginning of May 2017. At the Casey Kaplan Gallery, the vehicle was the centerpiece of the exhibition, and the show took its title, *Sport/Utility,* from the Escalade. In press accounts regarding the *Sport/Utility* artwork, the artistic significance of the 2008 Escalade was highlighted.

30.     As a result of defendants commencement of crushing before I and my crew arrived on April 12, 2017, their deceitful placement of the vehicle atop a stack of other vehicles – obviously intended to thwart inspection – and their delivery of the vehicle shortly before the show at Casey Kaplan was to begin, I assumed and understood that the vehicle delivered to the gallery was the same one that I had delivered to Bayview.

31.     In or about January 2021, a follower of my Instagram page argued with me that *Sport/Utility* was not a 2008 Escalade, provoking a public discussion on the subject, and the unfollowing of my Instagram page, because I had believed the car that I had delivered to Bayview was the same one that Bayview had delivered to Casey Kaplan, and defended the work on that ground. That is, because I had defended the work, I was deemed to lack credibility, and was unfollowed for that reason.

32.     Because of the public discussion, however, on January 22, 2021, I ordered and obtained a CarFax report. To my astonishment, it indicated that the 2008 Escalade, identified by its VIN number, had sustained collision damage in 2019 and 2020, after it was purportedly crushed by the defendants.

Case 3:24-cv-09172-MAS-RLS    Document 14-6    Filed 01/16/25    Page 12 of 14 PageID: 100

33.     Based upon my review of the Instagram follower's messages, photographs of *Sport/Utility* and its crushing, and the CarFax report, it was now clear that my 2008 Cadillac Escalade ESV was not actually the vehicle placed in the crusher by the "idiots" at Bayview on April 12, 2017, but instead that my vehicle had been surreptitiously swapped by the defendants with a standard Escalade from an earlier model year.

34.     That is, I realized they'd been defrauded.

35.     Although I had repeatedly explained my project requirements to the defendants, including the artistic significance of the white 2008 Escalade, and although the defendants represented to me in or about March and April 2017 that they would crush my 2008 Escalade according to my intentions for the artwork, the defendants never intended to do so. Instead, they fraudulently intended to convert my 2008 Escalade ESV for their own benefit and profit, while deceitfully swapping and crushing an insignificant vehicle, with a significantly lesser value.

36.     While the defendants represented to me in or about March and April 2017 that they would crush my 2008 ESV Escalade according to my requirements, when my film crew and I arrived at Bayview on April 12, 2017, the defendants had already deliberately and secretly substituted an earlier model of a standard white Escalade, despite knowing the importance of the 2008 model year Escalade to me and to my work.

37.     Defendants also surreptitiously placed the substituted standard Escalade on the crusher where my crew and I could not see it clearly, and began the crushing process before we arrived, to conceal the fact that the defendants had already substituted another vehicle in place of my 2008 Escalade ESV.

38.     Defendant Fanelli's remonstrations toward the Bayview employees who had begun crushing the substituted Escalade before the arrival of my crew and me on April 12, 2017 were designed to distract and prevent me from discovering that they had secretly substituted another vehicle in place of my 2008 Escalade ESV.

39.     If Bayview and its personnel had waited until my film crew and I had arrived at Bayview before they'd begun crushing the Escalade, as I and the defendants had agreed, my crew and I would have seen that they had surreptitiously replaced the 2008 Escalade ESV that I had delivered to Bayview, with another, different Escalade.

40.     If Bayview and its personnel had waited until my film crew and I had arrived at Bayview before they'd begun crushing the Escalade, as I and the defendants had agreed, my crew and I would have captured on video that they had secretly replaced the 2008 Escalade ESV that I delivered to Bayview, with another, different Escalade.

41.     As I was unaware of defendants' sleight of hand, I accepted delivery of the crushed vehicle at the Casey Kaplan Gallery, and made it the centerpiece of my exhibition, and incurred expenses to install the work at the gallery, and subsequently to store the work after the exhibition concluded.

42.     *Sport/Utility* nearly doubled in value from $180,000 to $350,000, and collectors were interested in purchasing the artwork, before the discovery that it is *not* a 2008 Escalade ESV. However, as a result of defendants' secret, fraudulent and deceitful conduct this work now has no value as *my* work of art, just as an imitation Picasso has zero value as a Picasso artwork. Defendants, by their fraud, have rendered *Sport/Utility* valueless.

43.     Further, given my stature and the need to protect the value of my artworks, my reputation, and my long-term artistic legacy, the fraudulent *Sport/Utility* artwork cannot be sold.

44.     Accordingly, because the defendants have failed to timely answer the complaint, I respectfully request that they be deemed to be in default, and that this matter be set down for an inquest on damages.

Kevin Beasley

Sworn to before me this 26st day of April, 2021
(videographically, as permitted by Emergency Executive Order 202.7, of March 19, 2020)

Notary Public
Richard E. Lerner
Commissioned Queens County
No. O2LE5032882
Expires September 6, 2021